UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN M. REGAN, JR.,

                Petitioner

    v.

BRIAN FISCHER, AS COMMISSIONER OF THE NEW
YORK STATE DEPARTMENT OF CORRECTIONAL
SERVICES; NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; WILLIAM M. POWERS
AS SUPERINTENDENT OF THE ALBION
CORRECTIONAL FACILITY; NEW YORK
STATE ATTORNEY GENERAL,

                Respondents.

**PETITION FOR A WRIT OF
HABEAS CORPUS UNDER
28 U.S.C. 2254**

**Docket No.**

---

The Petition of JOHN M. REGAN, JR., ESQ., respectfully alleges:

## JURISDICTION, VENUE AND INTRODUCTION

1. That I am an attorney at law admitted to practice in the State of New York, and am also admitted to practice before this Court, although for the reasons that follow I bring the within Petition in my own name since in my opinion I am the proper party to present this matter to the Court. Jurisdiction and venue are properly in this Court pursuant to 28 U.S.C. 2241.

2. The Petition seeks the immediate release of Sephora K. Davis (hereinafter "Sephora") - convicted upon an "Alford" plea of guilty to Attempted Armed Robbery in the First Degree under New York's Penal Law in Livingston County Court in satisfaction of indictment 2004-276, and currently an inmate at the Albion Correctional Facility operated by the New York State Department of Corrections, inmate number 07-G-0011 - on the grounds that she is being held in violation of the Constitution, laws and treaties of the United States, and also because her arrest, prosecution, conviction and imprisonment constitute a crime against humanity and human rights

abuse under well established principles of international law which every court in this country is

morally and legally bound to observe. The violation of international law is primarily the result of

the fact that Sephora was brutally raped by an individual named Eric Harder on December 8th,

2003. Harder subsequently became a police informant largely through having falsely implicated

Sephora as a willing participant in his own crimes which occurred shortly after he had raped her.

He did this in a conspiracy involving, at minimum, a then Mount Morris, New York police

officer named Dana Carson and the other co-defendants. In sum, Sephora has been raped, falsely

prosecuted and imprisoned by agents of the State of New York acting under color of official

authority, which is both a federal and an international crime, not to mention a frightfully barbaric

act.

　　　3. It is my opinion that I am the proper Petitioner because Sephora has never been able

to properly account for what occurred to her in the hours after she was raped, the time period in

which she supposedly actively engaged in the criminal conduct for which she is now imprisoned.

The reason for this is that Sephora was oblivious the whole time, having been violently raped and

then drugged, and was passed out or asleep in her own car while three other men, including her

rapist, used the car and her cell phone in the course of carrying out an armed robbery. By all

accounts, Sephora never left the car during the crime, which remained stationed away from the

scene, although later as a result of the criminal conspiracy she was falsely implicated as having

been the "driver" for the robbery. What is known about what occurred to her on the date in

question was all discovered by me, piecing together information from many sources over a long

investigation I personally conducted. I therefore conclude that I am the only person in a position

to establish the facts and conclusions relative to this application.

　　　4. The evidence supporting this Petition is both dismaying and irrefutable. The only

truly lawful response of the New York State Attorney General is to consent to the relief

requested; however, the Attorney General's office has already had several opportunities to end or

at least investigate the human rights abuse of Sephora Davis and has refused to do so.  Since there is no reason for me to believe the Attorney General will alter his adversarial posture in this proceeding I anticipate opposition.

5.  An opposed application presents serious difficulties of fair adjudication.  The basis of the application is not simply the factual innocence of Sephora Davis; it is also the criminal conduct of law enforcement officials in Livingston County, New York (see, e.g., 18 U.S.C. 241 and 242), potentially including members of the office of the District Attorney of Livingston County, Thomas E. Moran, Esq., in carrying out Sephora's prosecution.  Mr. Moran's first assistant, Eric Scheiner, is married to a federal prosecutor (Tiffany Lee, Esq.) who works in the Rochester federal courthouse where the Petition is being filed.  I will state at the outset that for this reason as well as others, I have absolutely no confidence that this Petition, if opposed, will receive a fair hearing anywhere in the Western District of New York.  Moreover, if a hearing is required, I have every reason to believe that Livingston County law enforcement officials will engage in witness tampering and intimidation, as indeed there is reason to believe they have already done so (see infra).  It is, after all, a relatively insignificant criminal sequel to their previous conduct.  But the local office of the Federal Bureau of Investigation, which would ordinarily be relied upon to protect witnesses in a proceeding in federal court, cannot be trusted here, as one of the officials in authority over them is connected by marriage to Livingston County law enforcement officials who may be implicated in that criminal conduct.

6.  Accordingly, I respectfully request that if this Petition is opposed by the New York State Attorney General that it be transferred to a different district.  If possible, because the Petition involves questions of human rights abuses under international law that have already been submitted to an international tribunal for consideration, and therefore ought to be a matter of concern to high federal government officials both in the Justice Department and the State Department, I request that the Petition be heard and determined in Washington, D.C. if opposed.

7. I am submitting herewith and incorporating herein a copy of the Motion for Leave to Appeal which was filed in the New York Court of Appeals January 25th, 2007 as a record of the most relevant proceedings in state court. There are several items of important evidence that are not included in that motion, and those are annexed hereto as exhibits.

## FACTS AND PROCEDURAL HISTORY

8. Sephora Davis and her parents first consulted with me as an attorney in June, 2004. At that time, she was being prosecuted in Livingston County Court on a Superior Court Information charging her with Robbery in the Second Degree, in violation of New York's Penal Law, stemming from an armed robbery and "kidnapping" that had occurred at about 4 in the morning on December 9th, 2003 in the Village of Geneseo, New York. She had been advised by her then attorney, Steven Sessler of Livonia, New York, to accept a guilty plea to that charge with an agreed upon sentence of two years in state prison.

9. Her parents wanted to fight the charges. Sephora claimed to be innocent but was more inclined to accept the offer because she feared a trial and the possibility of a life sentence (the kidnapping charge is an A-1 Felony in New York) with which the Livingston County District Attorney had threatened her. In the end, however, Sephora indicated that she, too, wanted to continue fighting.

10. My own circumstances were that I was trying to leave the practice of law. My wife and daughter had recently moved to Canada and it was understood between us that I would follow, but our finances were extremely poor. Taking Sephora's case made some financial sense because roughly $30,000 in legal fees were available and I estimated that one way or the other it would all be over in six months. In other words, for me taking Sephora's case was part of making a transition to a new life in Canada with my family. So I took the Geneseo case, along with a couple of minor charges she had incurred in the months since, with the intention of

wrapping it all up together by the end of the year. Sephora refused the plea and I was substituted as attorney of record in Livingston County Court.

11. I received the file (as it turned out, woefully incomplete due to the deliberate withholding of evidence by the prosecution) and a briefing from Steve Sessler, who indicated he wasn't sure about much of anything because Sephora's story seemed variable and inaccurate, and in my preliminary discussions with her I had found the same thing. Given the potential stakes and the problems with Sephora's story, the plea agreement to him had seemed reasonable as indeed it would to any criminal defense lawyer.

12. The primary evidence against Sephora in the file was a statement from an individual named Eric Harder dated January 23rd, 2004 - about six weeks after the robbery (*see exhibit "H" to the Article 78 Petition, under Exhibit "2" of the motion for leave*). In sum and substance, Harder indicated that Sephora had driven him and two accomplices named Adrian Paige and Shaun Theriault in her car to a house on Court Street in Geneseo a number of times on or about the date in question, culminating the 4 AM armed robbery on December 9th, thus implicating Sephora as a willing participant and accomplice in the crime.

13. There was also an unsigned statement from Sephora, dated December 22nd, 2003 (pre-dating Harder's statement by more than a month, only thirteen days after the robbery)(*see Exhibit "G" to motion of November 17th, 2006, under Exhibit 11 of the motion for leave*). In it, Sephora described driving her car at the time and place in question on a hunt for marijuana, but identified only two passengers named Dwayne Rose and Brock Hyde.

14. Within a few weeks my office received notice from the Livingston County District Attorney that he intended to present the matter against Sephora to a Grand Jury on or about October 6th, 2004. Strategically, Sephora would have to testify before the Grand Jury and properly account for herself, so it now became very important to clear up the confusion about her story. I began meeting with her regularly beginning about the middle of September, 2004.

15. In these meetings Sephora insisted that the unsigned statement she had given to the police on or about December 22nd, 2003 was true except for the names of her passengers. When asked how she came up with the wrong names, she indicated that this information had been provided to her by Adrian Paige in the days leading up to her contact with the police. Sephora maintained that the actual two passengers were Adrian Paige and Shaun Theriault. She denied that Eric Harder had ever been in her car, often adding emphatically and somewhat oddly that she did not know Harder "at all, whatsoever". She indicated that the first and only time she ever saw Harder was when their pictures had appeared together in the local newspaper after the arrests.

16. This posed a significant factual conflict with other evidence, notably the statement of Harder himself. Moreover, Paige, Theriault and Harder had all entered guilty pleas in April, 2004 and according to the transcripts of their colloquys, they had all maintained that they were in Sephora's car at the relevant time and that Sephora was driving it. Putting together the story the prosecution was telling from these sources, it appeared that Sephora and Adrian had gotten together first in the Geneseo/Mount Morris area; they then drove to Nunda and picked up Theriault, who brought a shotgun; they then headed north to Leicester to pick up Harder; and from there they went to Geneseo to perform the robbery.

17. Nevertheless, Sephora insisted that Harder had never been in her car and that she didn't know anything about a robbery. She maintained she had met Paige and Theriault in Geneseo and drove with them to Court Street to buy marijuana. They took her cell phone and left the car for a "long time" and returned having been unable to buy marijuana, then Sephora dropped them off by the Geneseo Burger King and went home.

18. Further details were very hard to come by. What did she do in the car all that time while Theriault and Paige were gone? She was unsure. I asked if the car was running with the heat on the whole time, it having been December and cold out. Sephora couldn't say. I asked if she fell asleep at all, it having been around 4 AM. She didn't know. If she hadn't been sleeping,

did she turn on the radio, listen to music? She indicated she might have. Where had she been

before she met up with Theriault and Paige? She wasn't sure. Was she out at a party, at

someone's house, had she been at her parents' home in Avon? She suggested her parents' house

but wasn't sure. I pointed out that the events occurred in Geneseo about 4 AM, and asked her if

she had been in the habit of leaving her parents' house in Avon after 3 AM on a weeknight to

drive to Geneseo to look for marijuana. She cried. I asked why, upon leaving the area, she

would take Paige and Theriault back to the Burger King in Geneseo, when she could just take a

left turn coming off of Court Street, drop them off and drive back to Avon, and she changed her

story and said that she had done just that, and asked if we could "stop talking about it". She

remained very definite at all times, however, that Harder had never been in her car.

19.    Sephora had a cell phone, and her parents had phone records of the outgoing calls

from that phone at the relevant times in December, 2003, and I thought these records might help

Sephora remember what she had been doing or where she had been, or provide some other useful

information. I asked Sephora to make a list identifying who she had called on the evening of

December 8th and the wee hours of December 9th in between our meetings, but she seemed

unable or unwilling to do that. Finally, with the Grand Jury date approaching, I sat down with

her to go through the calls together. Most of them were very brief one or two minute calls,

except for two calls of about 11 minutes each to a phone number in Shortsville, New York

occurring at 7:14 PM and 11:26 PM on the evening of December 8th (*see Exhibit "F" to the*

*Article 78 Petition, under Exhibit "2" of the motion for leave*). Sephora indicated she knew

this to be the number of a friend named Katrina Gerew. I asked why she would be calling

Katrina and Sephora said that she was worried about being pregnant at that time and that Katrina

was pregnant and she had talked to her about that. Of course, at the time this information seemed

neither illuminating nor useful in any way to me, except that it seemed a little odd that Sephora

would be engaged in that kind of conversation when she was supposed to be planning and

carrying out robberies, as alleged by the prosecutors.[1]

20.  Beyond that, the phone records yielded little information.  There were a couple of calls to phone numbers that Sephora could not identify, but that would be easily explained by someone else using her phone, and of course she could not remember who that might have been since she was uncertain about so much else.

21.  With the Grand Jury presentation looming and the stakes being very high, my approach became one of just getting as much information from Sephora as I could in the hope that something would turn out to be useful.  I tried to find out everything I could about Adrian Paige.  Sephora had met him through her younger sister Britni, who was friends with Adrian's girlfriend Angela.  Adrian was on parole, but seemed like a good person.  Adrian and Angela had a child together, and Angela had another child as well.  Sephora had done some babysitting for them, liked the children, and sometimes Adrian would provide her with marijuana.  Turning to Shaun Theriault, he was a somewhat infamous character in Livingston County, well known by a lot of people, especially the youth drug subculture of Mount Morris.  He had once worked a construction job for Sephora's parents, so they knew him, but beyond that he had no particular relationship to Sephora.  They were acquaintances who would greet each other when they happened upon one another, nothing more.

22.  I began thinking about Sephora's odd insistence that Harder had never been in her car and that she had never seen him before.  This seemed highly implausible given the other evidence contradicting it, but it was about the only thing on which she had been firm and

---

[1]  When I later discovered evidence that Harder had raped Sephora, the content of these conversations became important evidence:  Sephora had left the hospital at noon on December 8th having received a negative pregnancy test.  The fact that she was worried about being pregnant seven hours later implied an act of sexual intercourse taking place in the intervening time.  The only male likely to have been alone with her during that time had been Harder, according to information obtained independently from Adrian Paige (*see affidavit of Adrian Paige dated May 3rd, 2006 attached to Article 78 Petition, Exhibit "2" of the motion for leave*).  I was thus able to conclude that Harder had raped Sephora prior to 7:14 PM on December 8th.

definite.  I could not think of any reason for her to lie about it, since she readily admitted that Theriault and Paige had been in her car at the relevant time.  It was impossible that she would be mistaken about it, because she could not possibly drive around in her car with Harder in it and not know.

23.  Since Sephora had no known motive to lie and could not be mistaken, it seemed reasonable to me to tentatively conclude that she was telling the truth:  Eric Harder had never been in her car and she had never met him.  Since it was known and documented that Harder had been picked up from his workplace in Leicester to participate in the 4 AM robbery in Geneseo, several miles distant, then if Harder had not gone in Sephora's car this implied that a second car had been involved.

24.  Several other individuals on the periphery of the events had cars at their disposal, among them Sephora's friend Mechal Fuoco and Adrian's girlfriend Angela.  For reasons not relevant here, it seemed likely to me that Mechal was involved and she was driving the second car, if there had been one.  I prepared a long statement for Sephora to deliver to the Grand Jury, asking them to focus on investigating the involvement of other individuals and a second car.  I tried to shore up my uncertainty about this whole line of reasoning by testing Sephora:  at one point, I falsely told Sephora that the police would know every place her car had been that night due to an installed GPS locator in the car (the police and prosecutors had seized the car).  Thus, I told her, if her car had gone to Nunda or Leicester that night, the police and the Grand Jury would know it and she would be caught in a lie.  Sephora could not respond to this pressure other than by getting upset and crying.

25.  As an alternative to pressuring Sephora, which was both difficult and largely unproductive, it had also occurred to me along the way that I might go to see Adrian Paige, already serving his sentence at the Livingston County Correctional Facility south of Mount Morris, and see if I could get any reliable information from him.  The problem had been that I

had no leverage over Adrian, nothing to motivate him to tell me anything, or at least anything accurate. But Adrian was at least an opportunity to test the tentative conclusion that Sephora had never met Harder and that a second car had been involved.

26. I decided I could use the "second car theory" to advantage with Adrian by suggesting that I thought the second car was Angela's (his girlfriend's) and that I would have to implicate Angela unless Adrian told me otherwise and it was the truth. This tactic, it turned out, worked extremely well, but it was a bit late in the process. I did not come up with the plan until right before Sephora was due to testify on October 6th. Then, the weekend before, Sephora was involved in a motor vehicle accident as a passenger, sustaining a head injury of uncertain severity. I asked for her Grand Jury testimony to be postponed, and the prosecutor Mr. Moran allowed one week, until October 13th. I did not get to see Adrian until October 9th and 11th, 2004.

27. Adrian provided the first information I had that he - and not Sephora - had been driving Sephora's car at all the relevant times[2]. I was visibly dumbfounded by the revelation, prompting Adrian to ask me if I was still listening to him. Adrian also indicated that Sephora had been "sick all day" and "out of it", which was promptly corroborated by medical records showing that Sephora had in fact been released from a hospital in Dansville just a couple of hours before she met up with Adrian on December 8th. Adrian subsequently provided an affidavit for a proceeding I brought on Sephora's behalf under New York CPLR Article 78, containing the information he provided at these meetings (*see Paige affidavit under Exhibit "2" to the motion for leave*).

28. Of course, at this point the entire "second car theory" was refuted, and much of Sephora's behavior and information - or lack thereof - was now intelligible. However, I had only

---

[2] Unbeknownst to me due to Grand Jury secrecy rules at the time, Eric Harder had, in his October 6th Grand Jury testimony, identified Adrian as having been driving for part of the time. Mr. Moran was presenting the matter, and at the very least, therefore, was aware of a serious problem with the evidence against Sephora Davis from that time on.

two days to come up with a completely different statement for Sephora to present to the Grand Jury; Mr. Moran's approach to the case had already been somewhat inappropriately belligerent, and I believed that if I had asked for more time - a second adjournment - he would have refused and taken the position that Sephora had waived her right to appear before the Grand Jury.

29.  Further complicating things, Adrian's information contradicted what Sephora had been telling me about Eric Harder.  It appeared that not only was Harder in Sephora's car, but that he actually could have been alone with her in the late afternoon or early evening of December 8th.  That information, along with Sephora's strange denials and certain other information gained from medical records led me to suspect that Eric Harder had raped Sephora about that time.  But I could not explain why, if that had occurred, Sephora hadn't told the police or me or any of her previous attorneys or her parents, or indeed anyone else.[3]

30.  With these questions still open and no ready way to resolve them, I took Sephora in to the Grand Jury on October 13th, 2004, primarily with the goal of asking them to re-call Adrian Paige and to call me as a witness.  The Grand Jury, under Mr. Moran's instruction and supervision, refused to do any of this and indicted Sephora on every charge asked by Mr. Moran.

31.  In the wake of her indictment Sephora became quite difficult.  She evaded contact with me and her parents and would disappear for days at a time.  After several attempts she finally related to me - on November 9th, 2004 - the basic details of how Eric Harder had raped her, but there was still a great deal of information I didn't have (*see affidavit of Sephora Davis annexed to Article 78 Petition, Exhibit "2" to the motion for leave*).  I was eventually able to place the time of the rape at sometime around 5 PM and prior to 7:14 PM (the first 11 minute

---

[3]  I originally attributed Sephora's unwillingness to come forward to psychological issues; however, when she finally related the details of just how Harder had raped her (at knife point, in his residence in Mount Morris, under threat to her and her younger sister), it was plain she was simply terrified - particularly because Harder had threatened to kill her younger sister, too, if Sephora ever told anyone that Harder had raped her.

phone call to Katrina Gerew) on December 8th. The information supplied by Adrian Paige had more or less accounted for the time from midnight until the robbery at 4 AM, but Sephora could provide me with no information about the roughly five hour period between 7 PM on the 8th and midnight, and I had no information from anywhere else to account for this time period.

32. I then sought the assistance of social workers and rape crisis counselors, and also obtained the assistance of former Monroe County Assistant District Attorney Catherine Cerulli, Esq., who by then worked in the Department of Psychiatry at Strong Memorial Hospital. The rape counselor effort was unproductive, but Ms. Cerulli interviewed Sephora and was able to tell me that after raping Sephora, Harder stayed close to her for a while and perhaps went with Sephora to the home of Mechal Fuoco, Sephora's childhood friend and an acquaintance of Harder and who, like Harder, lived in Mount Morris.

33. In the meantime, I had brought a number of motions in Livingston County Court seeking, among other things, dismissal of the indictment and a determination of Sephora's competency to proceed. Most of these motions remained pending from December, 2004 until September, 2005 though the competency issue was not resolved until April of 2006.

34. I also made many efforts during this time period to prompt Sephora to recall what she could about the missing five hours, but she provided no new information. In a further effort to develop a litigation strategy for dealing with the charges against Sephora, I held many meetings and discussions with both her and her parents. All of them complained somewhat bitterly about the unfairness of Mr. Moran and the involvement of a Mount Morris Police Officer named Dana Carson in the investigation leading to Sephora's arrest and indictment, since Carson had for some time prior and subsequent to the events in question pressured Sephora sexually (*see Exhibit "J" to the Article 78 Petition, under Exhibit "2" to the motion for leave*). For most of

this time I discounted these complaints and refused to pursue them[4], believing them to be insufficiently supported by evidence and probably counterproductive.  For example, the only evidence I had of Carson's involvement in the investigation was that he was one of two police officer witnesses to Eric Harder's statement dated January 23rd, 2004.

35.  In September of 2005 I learned one piece of significant information relevant to the five hour gap.  After months of fits and starts, I was able to interview a witness named Stephanie Fox (*see Exhibit "B" to the Article 78 Petition, under Exhibit "2" to the motion for leave*). Stephanie Fox was friendly with Sephora's younger sister Britni, and Stephanie reported that she was present at the Davis household in Avon between approximately 8 and 9 PM on December 8th, and that during that time Sephora visited the house briefly with her friend Mechal Fuoco.  At first, I did not believe that Sephora could have retuned home to her parents' house shortly after having been raped and thought Stephanie must have the date wrong, but she was able to confirm the date because of a documented doctor's appointment she remembered having had the following day.  Delving further into the details of this visit, I was able to determine that Sephora had come into the house to change clothes (this is typical behavior of a woman who has just been raped) and that Harder, her rapist, had accompanied Mechal and Sephora to the house but remained outside in the car.  This explained a puzzling statement Sephora had made to me almost a year earlier when she first related the details of how Harder had raped her:  that he knew where she lived.

36.  The next significant development occurred on October 25th, 2005.  Mr. Moran provided me with some "Rosario" material prior to a scheduled "Huntley" hearing, which included police notes indicating that Dana Carson was the original police contact with Eric

---

[4]  I had told Mr. Moran in a letter dated December, 2004 (*see Exhibit "B" to November 17th motion papers, under Exhibit 11 to the motion for leave*) that Carson being a witness to Harder's statement was, under the circumstances, disturbing, but for many months assumed that Mr. Moran would tell me if there had been any deeper involvement by Carson in the investigation.

Harder (*see Exhibit "I" to the Article 78 Petition, under Exhibit "2" of the motion for leave*).
This was startling information, though it was to be over a year before further investigation and
other evidence confirmed the worst possible suspicion the information might generate:  that
Carson had actually conspired with Harder - Sephora's rapist - to falsely implicate her as a
willing participant in the armed robbery of December 9th, 2003.

37.  The October 25th development was also significant because it pointed to a pattern of
withholding important evidence by the Livingston County District Attorney.  As it turned out
there was a huge amount of evidence that was never provided to me or any of the attorneys
preceding me, even though at one point, in June of 2004, a plea agreement had been tentatively
struck.[5]

38.  Realizing that I was dealing with a District Attorney's office that was either
pathological or criminal or both, I briefly attempted a federal habeas corpus proceeding shortly
after the October 25th revelations, with the intention of seeking assistance and assent from the
New York State Attorney General's office, which would have to appear in opposition.  However,
the Attorney General's office was dismissive of the application and declined to exercise any role
in the matter.  For that reason I was eventually forced to withdraw the habeas petition.

39.  My continued involvement in the case generated, and continues to generate,
significant financial hardship for me.  The bulk of the anticipated legal fees were in the form of a
bail receipt and thus not available until the conclusion of the Livingston County criminal case,
but the case could not be concluded:  first, because no just compromise resolution was possible;
and second, with my investigation both incomplete and essentially obstructed by various
Livingston County officials including the District Attorney, there was no way to obtain even a
remotely fair trial.  At the same time, my continued personal involvement in the case was also

---

[5]  The District Attorney's file was eventually turned over to Donald M. Thompson, Esq., who replaced me
in the Livingston County Court action, but that did not occur until September of 2006.

essential, in my opinion, both because of the intricate and difficult to explain progress I had made in investigating the matter despite the obstruction, and because after great difficulty and effort I had finally established enough personal trust with Sephora and her family that we had a functioning attorney-client relationship, which I thought would be impossible for another attorney to duplicate under the pressure and circumstances then existing.

40.  In other words, I was locked in as the attorney on a major felony case representing a defendant - 18 years old with no criminal record at the time of her arrest - who was facing life in prison if convicted of the top charge.  I had taken the case as part of an exit strategy from the practice of law and eventually had no staff or partners to assist me.  And unless and until relieved I was subject to being ordered to trial on as little as four weeks' notice at any time - every minute of which would have been required, in my opinion, to prepare, even as there was no way such a trial could be fair and no way for me to be paid in the interim for work that had to be done.

41.  As a result, in addition to continuing financial distress, my personal life became a casualty of the prosecution of Sephora Davis.  My wife, living in Canada with our young daughter, and understandably unwilling to endure more years of my absence and our joint impoverishment, made other plans to move forward with her life which at that point - also understandably - did not include me.  This began in the early part of 2006.

42.  By then, due to the retirement of Judge Cicoria, Monroe County Family Court Judge Joan Kohout was assigned to the Livingston County criminal case against Sephora Davis.  In motions, I presented the constitutional and due process issues raised by the information my investigation had revealed up to that point, including withheld evidence by the District Attorney's office, but Judge Kohout was essentially hostile to hearing these issues, denied all the motions, and began to press the matter to a trial I knew could not possibly be fair.

43.  In May of 2006 I commenced on Sephora's behalf an Article 78 Proceeding in the Nature of Prohibition under New York's Civil Practice Law and Rules, naming both Judge

Kohout and Mr. Moran as Respondents. The proceeding was brought in the Appellate Division, Fourth Department. In July I withdrew as Sephora's attorney in Livingston County Court and was replaced in August by attorney Donald M. Thompson, Esq., though I continued representing Sephora in the Article 78 proceeding.

44. Judge Kohout exercised her option under CPLR 7804(i), declining to appear in the Article 78 proceeding and thus did not contest the allegations of the Article 78 Petition, which was her legal prerogative but was also, of course, extremely and deliberately obtuse under well recognized principles of international law, not to mention rudimentary precepts of morality and decency. Mr. Moran originally defaulted in appearing, but in early September upon a further conditional order of the Appellate Division granting judgment to the Petitioner submitted an Answer in the form of a "general denial", along with an affidavit, which together did not formally contest the petition's material allegations (*see Exhibit "6" to the motion for leave*). Argument of the Petition was scheduled for November 24th, 2006.

45. Later in September, attorney Thompson received voluminous discovery materials from the Livingston County District Attorney's office which he subsequently provided to me. In the meantime, based upon Mr. Moran's failure to contest the allegations of the Article 78 Petition, I brought a motion in the Appellate Division for judgment on the pleadings (*see Exhibit "7" to the motion for leave*) . Mr. Moran's attorneys brought a cross motion for judgment on the pleadings. On October 17th, 2006 both the motion and the cross-motion were denied (*see Exhibit "9" to the motion for leave*).

46. On or about October 18th, 2006, Mr. Moran tendered an "Alford" plea offer to Sephora in Livingston County Court of guilty to attempted robbery in the first degree with the minimum sentence of 3-½ years in state prison, with a deadline to accept or reject by October 20th, the next scheduled court appearance. Sephora accepted this offer (*see Exhibit "3" to the motion for leave*) ,and Judge Kohout approved the plea. Sentencing was scheduled for January

3rd, 2007.

47. Meanwhile, the discovery provided to attorney Thompson in September yielded several items of evidence requiring further investigation, which then produced irrefutable proof that Officer Dana Carson and Eric Harder - Sephora's rapist - had conspired to falsely implicate Sephora as a willing participant - the "driver" - in the crimes for which she was charged. This investigation proceeded through November, and a motion to renew the previous motion for judgment on the pleadings in favor of the Petitioner was brought on November 17th, 2006 (*see Exhibit "11" to the motion for leave*). Respondent Moran, through counsel, cross-moved to dismiss the Petition as moot based upon Sephora's October plea.

48. On December 22nd, 2006 the Appellate Division granted Mr. Moran's motion, dismissed the Petition and all other pending motions. The written opinion of the Appellate Division held that the allegations of the petition were "academic" (*see Exhibit "1" to the motion for leave*), but in what can only be described as an inexcusable and disgraceful example of moral cowardice, the opinion did not specifically mention the allegations that Sephora had been raped. I appealed, and applied for leave to appeal, to the New York Court of Appeals but that court dismissed both the appeal and the motion for leave as being moot on March 27th, 2007. I thereafter brought a petition for certiorari to the United States Supreme Court which was denied on October 1, 2007. On October 22nd, 2007, having cleared proceedings in the highest court in the United States, I filed a petition on Sephora's behalf with the Inter-American Commission on Human Rights in Washington, D.C., which remains pending. In that petition I have accused all of the relevant New York State officials of human rights abuses - including all of the relevant judges, who are not immune under international law as they are under domestic law.

49. I bring the within petition in a final effort to afford my state (through the NYS Attorney General) and nation an opportunity to renounce, correct and address the human rights abuse they have engaged in or are responsible for, although I have no illusions that this is likely.

Even as state court criminal justice systems such as New York's have become increasingly dysfunctional[6], federal courts have tended to show them more and more deference, and the ancient and "great writ" of habeas corpus has been largely gutted - overtly through legislation, and otherwise in practice: the Appellate Division, Fourth Department is not the only court that has learned it can ignore evidence of innocence with impunity. As I have indicated in my petition to the international tribunal, my belief is that even though this habeas corpus petition presents an unarguable case for relief, it is nevertheless futile. But I would be content to be proven wrong.

### THE CONSPIRACY TO FABRICATE EVIDENCE AGAINST SEPHORA DAVIS

50. The irrefutable proof of the law enforcement conspiracy to implicate Sephora is in the form of two written statements. One was the statement of an individual named Todd Gaddy; the other was a statement from his girlfriend or wife, named Ashley Baker. Both statements were taken on January 24th, 2004, the day after Eric Harder's statement, which had led to Sephora's prosecution. Both statements were withheld from me the entire time I represented Sephora in Livingston County Court, coming to light only when Donald Thompson received the District Attorney's file in September of 2006. Copies of the statements were attached to the motion papers of November 17th, 2006 (*see Exhibits "E" and "F" to Exhibit 11 of the motion for leave*).

51. Harder, Paige and Sephora had all been arrested and charged the previous day as a result of Harder's statement, which had been taken on January 23rd. But the last participant, Shaun Theriault, had not been apprehended. The Mount Morris Police were aware that Todd Gaddy was a friend of Theriault's and sought information from Gaddy about Theriault's

---

[6] See, for example, the report of the innocence project, located on the internet here:

http://www.innocenceproject.org/docs/NY_innocence_report.pdf

whereabouts.

52.  Gaddy worked at "Mark's Pizzeria" in Mount Morris and lived in an apartment above the pizzeria with Ashley.  Both Todd and Ashley were taken into custody and transported to the Mount Morris Police Station for questioning.

53.  Todd and Ashley were placed in separate rooms.  Todd was questioned by two officers and Ashley was separately questioned by one:  Dana Carson.  They told conflicting stories about an incident where Shaun Theriault, about two weeks before Christmas in 2003 (i.e., about the time of the robbery), had a conversation with Todd Gaddy in the pizza shop.  The conflict pertained to the content of the conversation.  Gaddy, the actual participant in the conversation, claimed that Shaun had talked to him in the pizza shop about having left a shotgun in Todd's apartment, but nothing was said about why - i.e., about the robbery in Geneseo taking place previously - until a subsequent conversation which occurred later on the balcony of Todd's apartment.

54.  Ashley's statement, by contrast, claimed only to have overheard a portion of the conversation between Todd and Shaun in the pizza shop (she was not a participant in the conversation), and further that she overheard only one thing said by Shaun:  "Sephora was the driver."  The statement was handwritten by Dana Carson.  Ashley's statement indicates, in other words, that Shaun Theriault discussed the robbery in the pizza shop, whereas Gaddy indicated that that subject didn't come up until a later meeting with Shaun Theriault.

55.  The conclusion that Ashley Baker's statement is false on that very point - that is, that she heard Shaun Theriault say that "Sephora was the driver" for the robbery - is inescapable: first, because the statement has indications of falsehood on its face; second, because Shaun Theriault's alleged declaration is inherently implausible in view of Dana Carson's role in generating it; third, because the substance of that declaration is contradicted by many different items of evidence, all independent of the statement and of each other; and last, a number of these

items of evidence and the unavoidable inferences therefrom are so reliable they cannot be rationally disputed.

### WHY THE FABRICATION OF EVIDENCE INDICATING SEPHORA DAVIS WAS DRIVING HER CAR AT THE RELEVANT TIME IS DETERMINATIVE OF THE VALIDITY OF HER PROSECUTION, AND THUS THIS APPLICATION

56.  By all accounts Sephora Davis never made an appearance at the actual site of the robbery.  None of the victims reported having seen her.  Even by the account of the events offered by her prosecutors, then, she remained in her car which was parked off site during the robbery some distance away, a car which itself was never seen by the victims.

57.  Sephora was therefore charged as an accessory to the crime, for " knowingly aiding and abetting" the others.  The primary alleged conduct constituting the alleged assistance was that she drove the getaway car - in other words, that she was the "wheelman" for the robbery.  If the evidence that she was doing so was all knowingly fabricated and falsified in a conspiracy involving police, their agents and/or prosecutors then her prosecution was a violation of due process and she is being unlawfully held prisoner by the State of New York.  As more fully appears below, it is certain both that Sephora was not driving her car at the relevant time and that there was a law enforcement sponsored conspiracy to fabricate evidence indicating the opposite.

### THE COLLOQUYS, TESTIMONY AND RECANTATIONS OF THE RELEVANT WITNESSES - HARDER, THERIAULT AND PAIGE.

58.  By early April of 2004, when Shaun Theriault, Adrian Paige and Eric Harder entered their guilty pleas in Livingston County Court, they all falsely maintained that Sephora was driving the car at the relevant time, according to the transcripts of the court proceedings.  Since Sephora herself had never disputed that she was driving her car at the relevant time, there were no witnesses at that time who maintained anything to the contrary, and thus no basis for anyone representing Sephora to suspect otherwise.

59. Under this scenario, Sephora had to have joined up with Adrian Paige in Geneseo between 2 and 3 AM on December 9th, 2003; then proceeded south to Nunda, a distance of about 15 miles, to pick up Shaun Theriault; thence to Leicester, a distance of about 12 miles, to pick up Eric Harder; thence the final 3 or 4 miles to Geneseo where the robbery occurred.

60. The first crack in this monolithic official evidence occurred on October 6th, 2004, some 10 months after the fact. By then I was representing Sephora. On that date Eric Harder, in an apparent contradiction of the testimony of both Theriault and Paige, testified before the Grand Jury that when he was picked up in Leicester, Adrian Paige was driving Sephora's car, though he also testified that later Sephora was driving. Due to Grand Jury secrecy rules, however, a transcript of Harder's testimony was not provided to me until January of 2005.

61. Entirely independent of this, Adrian Paige confirmed that he was driving Sephora's car at all the relevant times in my meetings with him which took place October 9th and 11th, 2004. In those meetings Adrian indicated he had already testified before the Grand Jury and offered to return to tell them the same things he had told me; but as with Harder's testimony, at that time I did not know that Adrian was recanting because his Grand Jury testimony a few days earlier was of course secret.

62. On two occasions in the summer of 2005 I interviewed Shaun Theriault at the maximum security Auburn Correctional Facility. Theriault would neither confirm nor deny that Sephora was driving. Based upon my interviews with him, in my opinion Shaun Theriault is incapable of providing reliable information one way or the other.

63. In any event, as of October of 2004, with Adrian Paige's recantation, the question of whether Sephora had been the driver of the car during the robbery became hotly contested, at the very least. Prior to that time, no one in a position to contest that fact had officially done so.

## HIGHLY RELIABLE AND INDEPENDENT EVIDENCE
## CORROBORATES PAIGE'S RECANTATION

64. The first thing Adrian Paige said to me in detailing the events leading to Sephora's prosecution was that Sephora had been "sick all day" and "out of it". This was promptly confirmed by medical records from Noyes Memorial Hospital in Dansville, New York indicating that Sephora had been treated in their emergency room from about 10 AM to noon on December 8th, 2003 for a severe toothache; had not slept the night before due to the pain; and had been administered a pain killer called "Toradol", which according to its manufacturer is capable of producing drowsiness all by itself. By Adrian's account, Sephora had originally appeared at Adrian's residence in Geneseo at about 2 PM on December 8th, or roughly two hours after she was released from the hospital in Dansville. This is irrefutable corroboration of Sephora's impaired condition on December 8th, 2003 and highly reliable, independent support for the proposition that she was not driving her car at any of the relevant times.

65. Entirely separate from Paige's recantation, and much earlier (within a few hours of the crime)(i.e., late morning of December 9th) the police, along with one of the victims named Colin Edenfield attempted a "controlled call" to Sephora's cell phone. Colin Edenfield's statement (*annexed hereto as Exhibit "A"*) describing this call confirms what Sephora had told me: that she had received a phone call from a male telling her he "had the money", and that she didn't know what he was talking about and hung up. Sephora had put this information in an affidavit before we even knew the Edenfield statement existed (*see Sephora's affidavit of May 17th, 2006 paragraph 9, annexed to Article 78 Petition under Exhibit "2" to motion for leave*). Thus this is independently confirmatory evidence, obtained by police the same day as the crime took place, indicating that Sephora was unaware of what had occurred, which would be impossible if she had been driving her car and consciously participating in the robbery a few hours earlier. This same statement, clearly exculpatory, was withheld from me the entire time I

represented Sephora in Livingston County Court, even though I was aware that a "controlled call" had taken place and specifically requested any records of the call from Mr. Moran directly, and in open court from Judge Kohout during my representation of Sephora in Livingston County Court beginning in early 2006.

66. My own observations of, and discussions with, Sephora indicated that she was completely ignorant of the events surrounding the robbery on December 9th, 2003. She could not supply any details of her activities. She could not relate a single reliable observation: she was not even sure that she had *not* been accompanied by two other individuals named Dwayne Rose and Brock Hyde, as her December 22nd statement to police had indicated (Adrian had introduced Harder to Sephora for the first time on December 8th, 2003 but had indicated Harder's name was "Brock"). She "knew" about the events in question only what she had been told to say by Adrian. Since she had no motive to lie to me or her other attorneys (in fact she had been offered immunity early on, a powerful incentive to come forward with accurate information), it is extremely unlikely that her shifting and uniformly inaccurate accounts of what had occurred were the product of any desire to evade or mislead; far more likely they were simply the result of an effort to appease her questioners - including her previous attorneys and me - in response to understandably intense pressure. Again, if Sephora had been awake and driving her car at the relevant time this demonstrated ignorance would be impossible, absent some additional psychiatric or psychological impairment for which there is no evidence whatever.

67. Harder's Grand Jury testimony indicated that when he was picked up from work in Leicester, Adrian was driving Sephora's car. Both Shaun Theriault and Adrian Paige indicated in their plea colloquys and Grand Jury testimony that Sephora had been driving throughout the various points on the way. Adrian recanted his testimony while the Grand Jury was still meeting. Shaun demurred on the same point later. Overall, then, the shifting accounts of the only persons in a position to know whether Sephora was driving her car at the relevant time indicate that she

was not doing so.

68. Mechal Fuoco's affidavit obtained July 5th, 2006 (*see Exhibit "D" to November 17th*

*motion papers, under Exhibit "11" to the motion for leave*) confirms Adrian's recantation on

the point that Sephora had unknowingly been given heroin a few hours before the robbery. This

further corroborates by way of inference that Sephora was not driving her car at the relevant time

because she would not have been capable of it, particularly when combined with the

documentary proof that she was sleep deprived and had been in the hospital on the morning of

December 8th.

69. Harder's rape of Sephora between roughly 5 and 7 PM on December 8th, which has

never been disputed, was violent and brutal enough to disorient and traumatize her in its

aftermath. When coupled with her otherwise impaired condition, it profoundly corroborates

other information that she was not driving her car at the relevant time.

70. In sum: the evidence of Sephora's visit to Noyes Memorial Hospital in Dansville on

the morning of December 8th is incontrovertible, and uncontaminated by any other evidence;

Colin Edenfield's December 9th statement was generated by the police themselves in the ordinary

course of their investigation, and was taken very close to the time of the actual crime and before

anyone would have had time to formulate an elaborate plot to fabricate evidence, unlike all of the

evidence implicating Sephora as "the driver", which did not appear for another six weeks (with

the exception of Sephora's own unsigned statement of December 22nd, which was false in almost

every respect); my own substantive discussions with and observations of Sephora did not occur

until September of 2004, were independently obtained by me as her defense counsel at that time,

were consistent with the information I had received from attorney Steve Sessler, and took place

at a time when I did not even suspect that Sephora had been passed out and not driving her car,

since I did not get that information from Adrian Paige until October 9th and 11th, 2004; and

Mechal Fuoco's statement was not obtained until July of 2006, but is based upon personal

knowledge and observation independent of Paige's observations.

## ALL OF THE EVIDENCE INDICATING THAT SEPHORA WAS DRIVING HER CAR AT THE RELEVANT TIME IS DEMONSTRABLY UNRELIABLE

71. With the exception of Sephora's own unsigned and highly unreliable statement of December 22nd, 2003 none of the evidence implicating her as "the driver" appeared until approximately six weeks after the fact.

A. There is a statement dated January 23rd, 2004 from an individual named William Annis, who claims to have seen Sephora driving her car when Eric Harder was dropped off at work in Leicester after the robbery; but Annis was identified to police by Eric Harder himself, who by then was already conspiring with Mount Morris Police Officer Dana Carson to fabricate that very evidence.

B. Ashley Baker's statement dated January 24th, 2004.

i) This statement is unsworn and handwritten by Dana Carson, who again by then was already conspiring with Harder to fabricate this exact evidence against Sephora. Police officers are trained to have their witnesses swear to their statements; Carson's omission in that respect is extremely unlikely to be a coincidence, particularly when considering how contentious the issue of who was driving the car became later, after Adrian Paige's recantation. Also significant is that Carson did not sign the statement as a witness, although he did sign as a witness every other statement he was known as having been involved in taking.

ii) Ashley Baker's statement is also, to the extent relevant here, hearsay, reporting only what was said by Shaun Theriault.

iii) Ashley Baker's statement is also contradicted by Todd Gaddy's statement, which was separately obtained by Mount Morris Police Officers.

C. Adrian Paige's Grand Jury testimony of October 6th, 2004, recanted on October 9th and 11th, 2004 and later in an affidavit dated May 3rd, 2006, with the recantation yielding additional corroborating evidence of an unimpeachable nature (e.g., medical records)

D. Shaun Theriault's Grand Jury testimony of October 6th, 2004, which is at least unreliable, given his later equivocation and Adrian Paige's recantation.

E. Eric Harder's Grand Jury testimony of October 6th, 2004 was otherwise inexplicably ambiguous and variable on the issue of whether Sephora was driving and was also contradicted by both Paige's and Theriault's original accounts.

F. Further, note that according to Adrian Paige's affidavit of May 3rd, 2006, he and

Theriault were not segregated from each other prior to giving their testimony (*see affidavit of Adrian Paige dated May 3rd, 2006, paragraph 25, annexed to Article 78 Petition, under Exhibit "2" to the motion for leave*).

72. In sum, all of the evidence that Sephora was the driver is testimonial, six weeks or more after the fact with no supporting or corroborating evidence contemporaneous with the events (and in fact contradicted by such evidence as is known to exist), subsequently contradicted through recantations, and all connected to two persons - Harder and Carson - who had motives to fabricate the evidence.

## THE UNAVOIDABLE CONCLUSION

73. If all of the evidence that Sephora was driving her car at the relevant time is demonstrably unreliable, and all of the evidence indicating she wasn't driving her car at the relevant time is independently corroborated, sometimes with sources - such as medical records - that are unimpeachable, then no rational fact finder could conclude that Sephora was driving her car at the relevant time and would be forced by the sheer overwhelming weight of the evidence to conclude that Sephora was in fact *not* driving her car.

74. But if that is true, then due to the testimonial nature of the proof in the affirmative (i.e., that she was driving her car), any rational fact finder would likewise be forced to conclude that the affirmative evidence was not just false, but willfully fabricated. And indeed, this is implied by the fact that Mount Morris Police Officer Dana Carson and/or Eric Harder were connected to every piece of evidence indicating "Sephora was the driver" obtained on January 23rd and 24th, 2004.

75. Beyond the above referenced and egregious <u>Brady</u> violations by the Livingston County District Attorney's office - which all by themselves constitute a due process violation serious enough to justify granting the within application - a criminal prosecution based upon evidence fabricated by state agents, such as police officers and informants, is a conscience-

shocking violation of due process.  When coupled with Sephora's brutal rape at the hands of Eric

Harder, one of the state agents who actually helped fabricate the evidence, the criminal

prosecution of Sephora Davis takes on the character of an international human rights abuse, the

kind which our own federal government routinely condemns when perpetrated in other,

supposedly less enlightened nations.[7]

### CIRCUMSTANTIAL EVIDENCE INDICATES THAT UNKNOWN ELEMENTS OF THE MOUNT MORRIS POLICE DEPARTMENT HAVE ENGAGED IN WITNESS TAMPERING AND INTIMIDATION IN CONNECTION WITH THIS INVESTIGATION

76.  I did not have either Todd Gaddy's or Ashley Baker's statement until September of

2006; but I had other evidence from another witness I had interviewed independently much

earlier which corroborated Todd Gaddy's statement.  However, I have never identified this

witness for a court and I cannot identify this witness at this time since, based upon what follows,

I have reason to believe that Todd Gaddy and perhaps Ashley Baker were subjected to witness

tampering and intimidation by the Mount Morris Police Department shortly after I identified

them as witnesses in the Article 78 Proceeding in November of 2006.

77.  I have reason to believe from other sources that Todd Gaddy had, and may continue

to have, a side business of selling marijuana with the tacit permission of the Mount Morris

Police.  As a result, as in any similar situation, he has an uneasy but familiar working relationship

with that police department.

78.  After identifying the significance of the statements of Todd Gaddy and Ashley

Baker in September and October of 2006, I endeavored to interview both of them in preparation

for filing a motion in the Article 78 proceeding then pending in the Appellate Division, Fourth

Department.  I was assisted by a private investigator, James Monroe, who was associated with

---

[7]  I have commented upon this odious comparison in a published article that can be seen on the internet here:  http://www.lewrockwell.com/orig5/regan-j3.html

attorney Donald Thompson's law office.  Because I was aware of Todd Gaddy's potential

connections to the Mount Morris Police, I attempted to approach this effort with great caution so

as not to alert Gaddy beforehand of the subject matter.  Of course this is very difficult to

accomplish, and unfortunately before we were actually able to speak to him, Gaddy became

aware of who we were and the subject matter to be discussed, because Mr. Monroe had made a

prior attempt to contact him in Mount Morris and left a business card, along with relating the

substance of our inquiry.

79.  When Mr. Monroe and I finally met with Mr. Gaddy in mid-November of 2006, his

demeanor was very friendly, cooperative and forthcoming; there wasn't a hint of guardedness or

suspicion, as one would normally expect from an individual being contacted by an attorney and a

private investigator.  He gave an account of the circumstances surrounding his earlier statement,

by then almost three years old, but changed his story in respect to the very point at issue:  he now

maintained that Shaun Theriault had discussed the robbery in the pizza shop, and had said that

"Sephora was the driver.", just as Ashley Baker's statement indicated.  Ashley Baker, it turned

out, was by now Todd Gaddy's wife.

80.  The fact that Gaddy had advance notice of the subject matter provided Gaddy with

an opportunity to inform his associates at the Mount Morris Police Department.  It is therefore

reasonable to believe that Gaddy changed his account as a result.  In any event, it is as a practical

matter impossible that Gaddy would remember what occurred and what was said differently and

more accurately nearly three years after the fact, just coincidentally conforming to Ashley

Baker's account whereas before the statements were in conflict.  The only reasonable conclusion

is that this change in Gaddy's story was part of a crude effort to hide or alter the otherwise

indisputable evidence of Dana Carson's complicity in fabricating evidence against Sephora

Davis.

81.  Beyond that, however, I have reason to believe that Gaddy was contacted in

connection with a separate investigation shortly after I filed the motions identifying him in the

Appellate Division on November 17th, 2006; but for reasons that at this point don't make any

sense to me, I am ethically barred by stating in these papers or in open court the basis for this

belief.  Nevertheless, I also believe that as a result of this second contact Gaddy began to visibly

waiver under the pressure, and was shortly thereafter arrested by the Mount Morris Police in an

effort to intimidate and silence him, which has been effective so far (*See attached Exhibit "B"*).

82.  In addition, some months ago, about the spring or summer of 2007, my office phone

number received a voice mail message from a female who identified herself as "Ashley".  I

suspected it was from Ashley Baker, but having no way to protect her from the Mount Morris

Police Department, I did not return the call for some weeks.  When I finally did so, the phone

number "Ashley" had left was no longer in service.

83.  Moreover, in the course of my investigation of these matters, I had occasion to speak

with a member of the Mount Morris Village Board named Jon LaDelfa, who related that there

were other incidents of witness intimidation by certain Mount Morris police officers in order to

suppress scandal and exposure of wrongdoing.  This is detailed in my affirmation to the

Appellate Division of September 20th, 2006, paragraphs 29 et seq. (*see motion papers of*

*September 20th, 2006 under Exhibit "7" to the motion for leave*).

84.  I should also point out that members of the Mount Morris Police Department had

and have a strong motive to do precisely what I have outlined above.  Beginning in about the fall

of 2004, the Department was embroiled in scandal, eventually resulting in the resignations of two

chiefs and a village referendum on the question of whether to abolish the department.  The

department was approved overwhelmingly at that referendum, which was held in June of 2006,

but only after a grotesque and cynical exercise of political clout by the department and the police

union.  Obviously, a scandal erupting in the midst of all this controversy, of the nature this

investigation uncovered, would have much larger and very negative ramifications for the Mount

Morris Police Department, so a concerted effort to suppress such a scandal is hardly surprising.

85.  Accordingly, since at the very least there is reason to believe that members of the Mount Morris Police Department have systematically engaged in witness tampering and intimidation in connection with the prosecution of Sephora Davis, and certainly engaged in a conspiracy to fabricate evidence against her and commit perjury, the adjudication of this petition, should it be contested and require a hearing, is highly problematic.

## THE INTEGRITY OF THE NEW YORK COURTS THEMSELVES, ALREADY IN QUESTION DUE TO OTHER FACTORS, IS IMPLICATED BY THE PROSECUTION OF SEPHORA DAVIS

86.  Neither I nor Sephora Davis have the capacity to counter the perfidious conduct, outlined above, by a seriously corrupted law enforcement establishment.  We are powerless by comparison.  Traditionally, powerless victims of injustice seek refuge, redress and justice in courts where the rule of law, in theory, levels the playing field.  But the reality is very different, as the experience of the 2006 Article 78 Proceeding on behalf of Sephora Davis shows.

87.  That proceeding, in the nature of Prohibition, originated in the New York State Supreme Court, Appellate Division, Fourth Department in Rochester, New York.  While the Fourth Department is ordinarily an intermediate appellate court, it functions as a trial court where a "superior court" judge is a respondent in a special proceeding, as Judge Kohout was in the Article 78 proceeding.

88.  The judges of the Appellate Division stand for election but hold 14 year terms of office.  They are elected to the trial court - the New York State Supreme Court - and serve on the Appellate Division by virtue of an appointment by the Governor.

89.  The long term of office afforded these judges is an effort to attenuate political and other corrupting influences on the judiciary, but this effort has had little success.  In 2006, a federal judge in the Eastern District of New York held that the entire process of electing justices of the New York State Supreme Court was unconstitutional.  Lopez Torres v. New York State

Board of Elections, 411 F.Supp 2d 212 (EDNY, 2006)(Gleeson, J.) The decision was based

upon an extensive record after a fact finding hearing, in which pervasive political corruption of

New York's judicial selection process was noted. The determination was later affirmed by the

Second Circuit at 462 F.3d 161 (2nd Cir., 2006).

90. Lopez-Torres was recently reversed by the United States Supreme Court, but the

concurring opinion of Justice Stevens emphasizes that the reversal does not diminish the

significance of the fact findings made by Judge Gleeson. Moreover, a recent study by the

Innocence Project characterized New York's criminal justice system as "broken" and

documented that New York has the highest number of known wrongful convictions in the

country.[8] Significantly, the two New York judges who contributed to the Innocence Project's

report were both retired.

91. Why is this significant? I offer as anecdotal evidence the recent, well publicized

case of local Monroe County Sheriff Deputy James Telban. Telban was involved in a motor

vehicle accident in which he drove his pickup out of a driveway onto a roadway into the path of a

motorcycle. The resulting collision killed the motorcyclist. Telban was drunk at the time,

having a measured blood alcohol content of .24%, three times the legal limit. He was charged

with vehicular manslaughter. When his trial occurred in May of 2007, he opted for a bench trial

as opposed to a jury. He was acquitted of the manslaughter charge, convicted of driving while

intoxicated and received probation and some weekends in jail.

92. I ask the Court and the Attorney General to honestly and squarely face a truth that

everyone who has worked in our justice system knows, but ordinarily can never admit or

acknowledge: no one but a police officer such as Telban would have opted for a bench trial and

attained such a favorable result in those circumstances.

---

[8]  http://innocenceproject.org/docs/NY_innocence_report.pdf

93. Consider, then, the foregoing taken together: (a) the prevalence of wrongful convictions in New York courts is documented; (b) the corrupting influence of political pressure on the judiciary has been proven in a federal court; and c) the considerable political power wielded by police and their unions, apparently also upon New York judges, of whom only two - both retired - have been willing to publicly express concern over the pervasive, documented and ongoing systemic problems that the sheer abundance of wrongful convictions reveals.

94. Yet even given all of that, it is impossible to measure or quantify the impact of the political power of the police upon outcomes in particular cases, other than by anecdotal comparative proof. Nevertheless, the cases of Sephora Davis and James Telban provide precisely this kind of proof, and distressingly show that at this point - at least in western New York - police have enough raw political power to commit rape and even homicide with impunity.

95. The role of the state's judiciary in ratifying these results is more distressing still. The fact that Deputy Telban opted for a bench trial, in a situation where almost no other defendant would, is very telling. The December 22nd, 2006 published opinion of the Appellate Division in Sephora Davis' Article 78 proceeding, which conspicuously omitted any mention of either the brutal rape to which she had been subjected or the law enforcement conspiracy to fabricate evidence against her despite the fact that solid proof was offered in the Petition and subsequent motions (and indeed that proof stood unchallenged), not only invites unfavorable comparisons to the supposedly backward judicial systems of such countries as Saudi Arabia; it also indicates an extreme favoritism towards law enforcement, such that serious and documented allegations of wrongdoing against their members will apparently not even be judicially acknowledged, let alone considered. This could have a number of explanations, of course, but surely among them is that even the relatively insulated justices of the Appellate Division are affected by the political power of the police and their unions.

96. Whatever political or systemic disease is at work in the New York courts, however,

this much is clear:  the ongoing imprisonment of Sephora Davis is an affront to the United States

constitution, its laws and treaties, and violates very basic tenets of civilized behavior and human

decency.  I ask this Court to order an end to that imprisonment immediately.

97.  I also believe that a federal investigation of this entire matter is called for, although I

obviously have no control over that.  In the absence of such an investigation, however, I will

continue to seek the intervention of international investigative and adjudicatory bodies into the

circumstances surrounding this atrocity, as long as I am capable of doing so, or until some

semblance of redress is had.


AFFIRMED UNDER PENALTY OF PERJURY THIS 15TH DAY OF
FEBRUARY, 2008


JOHN M. REGAN, JR.
Pro se
334 Oxford Street, Apt. 1
Rochester, NY   14607
Tel:  585.546.8880

**EXHIBIT "A"**

VILLAGE COURT VILLAGE   OF GENESEO





People of the State of New York

vs.

_____
DEFENDANT

## SUPPORTING DEPOSITION
## GENERAL

I, Colin Edenfield, residing  at 56 Court Street, Geneseo New York 14454, by this Supporting Deposition make the following allegations of fact in connection with an accusatory instrument filed, or to be filed, with this court against the above named defendant:

In addition to the statement I gave Major Ellis, I did receive a call from Andrean Paige. He called me last night on December 8th, 2003. He left me a voice mail message, telling me that I should be carefull. I forgot to tell the police this information.

I made several controlled telephone calls, with the police department present. I called Byron's cell phone, which was stolen. I tried to make contact with the people that were calling me earlier. I called the cell phone and received no answer. I then called 739-6104 and spoke to a female. This telephone number was also used to call my cell phone, asking for more money. The female told me that she didn't know anything.

About a half hour later, I received a call from Andrean Paige. He asked me how I was doing. We talked about the two guys threatening me with a gun and wanting money. Andrean made it sound that he might know who is involved. He told me that he would call me back, on my cell phone.

*Verification By Subscription And Notice*
*Under Penal Law Section 210.45*

*It is a crime, punishable as a Class A. Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.*

AFFIRMED UNDER PENALTY OF PERJURY THIS
9th Day of  December, 2003

_____
DEPONENT

000155

**EXHIBIT "B"**

http://www.rnews.com/print.cfm?id=44382

# Mt. Morris Man Shoots Deer In Town

by Mark Schoenberger
Published Dec 12, 2006

Police arrested a Livingston County man after investigators say he illegally shot a deer.

Todd Gaddy, 30, of Mount Morris was charged with reckless endangerment of property and unlawfully taking of wildlife.

Police say Gaddy shot the deer on the Livingston County campus in Mount Morris over the weekend. The deer was found near several county buildings.

Gaddy was arraigned and is scheduled to appear in court at a later date.

rg



© 2007 Time Warner Cable
Rochester, NY
All Rights Reserved

10/14/2007 3:11 PM